LOPEZ *v.* HOLLEMAN.

Feb. 1, 1954

Nos. 39042, 39128 51 Adv. S. 32 69 So. 2d 903

824

*Gore & Gore,* Jackson; *Howard A. McDonnell, Albert Sidney Johnston, Jr., Jules A. Schwan,* Biloxi; *Ray M. Stewart,* Picayune, for appellant.

*Newton & Blass,* Wiggins; *Morse & Morse, William H. Stewart,* Poplarville, for appellee.

*J. D. Stennis, Jr.,* and *Thomas J. Wiltz, Jr.,* Biloxi, Amici Curiae.

ETHRIDGE, J.

This is a contest of a special election of March 31, 1953, for the office of District Attorney for the Second Circuit

Court District of Mississippi, consisting of Stone, George, Hancock, Harrison and Jackson Counties. There were three candidates. The results of the election as certified by the County Election Commissioners to the Secretary of State were: Arnaud O. Lopez, 5,611 votes; J. Boyce Holleman, 5,468 votes; and Tom Wallace, 1,666 votes. In other words, the official returns reflected that Lopez received 143 votes more than Holleman. Holleman filed a contest of the election under Sec. 3287, Code of 1942, and that suit on the merits is No. 39128 in this Court. The appeal by Lopez in that cause is from a judgment of the Circuit Court of Pearl River County in favor of the contestant, Holleman.

Cause No. 39042 is an appeal by Lopez from a judgment of the Circuit Court of Harrison County granting Holleman a writ of mandamus to compel the circuit clerk of that county to allow him to examine the ballot boxes and their contents. On motion of appellant, both of these causes were consolidated by this Court.

The election contest is based upon Code of 1942, Sec. 3287, which provides: ''A person desiring to contest the election of another person returned as elected to any office within any county, may, within twenty days after the election, file a petition in the office of the clerk of the circuit court of the county, setting forth the grounds upon which the election is contested; and the clerk shall thereupon issue a summons to the party whose election is contested, returnable to the next term of the court, which summons shall be served as in other cases; and the court shall, at the first term, cause an issue to be made up and tried by a jury, and the verdict of the jury shall find the person having the greatest number of legal votes at the election. If the jury shall find against the person returned elected, the clerk shall issue a certificate thereof; and the person in whose favor the jury shall find shall be commissioned by the governor, and shall qualify and enter upon the duties of his office. Each party shall

be allowed ten peremptory challenges, and new trials shall be granted and costs awarded as in other cases. And in case the election of district attorney or other state district election be contested, the petition may be filed in any county of the district or in any county of an adjoining district within twenty days after the election, and like proceedings shall be had thereon as in the case of county officers, and the person found to be entitled to the office shall qualify as required by law and enter upon the duties of his office.''

Appellant makes the following basic contentions: (1) The Circuit Court of Harrison County had no power or jurisdiction to issue a writ of mandamus to compel the circuit clerk of that county to allow Holleman to examine the ballot boxes and their contents; (2) the Circuit Court of Pearl River County, hearing the election contest, No. 39128, and acting upon a jury verdict, erred in excluding the returns from Biloxi Precinct No. 4 and the White Plains Precinct in Harrison County. Returns from those two boxes were held in effect to be void because of widespread fraud and irregularities by the election officers. We affirm both of the judgments appealed from.

## I.

Appellant Lopez argues that the Circuit Court of Harrison County had no power by writ of mandamus to allow appellee Holleman to inspect the ballot boxes and their contents; and that for that reason all of the evidence obtained by such inspection was unlawfully obtained and not admissible in evidence. The election occurred on March 31, 1953. Under Sec. 3287, Holleman had twenty days after the election to file in the circuit court a petition contesting it. The time for contest would terminate at midnight on Monday, April 20th. On April 16th, Thursday, Holleman filed in the Circuit Court of Harrison County a petition for a writ of mandamus against Ewart G. Lindsey, Clerk of the Circuit Court

of Harrison County, and custodian of the ballot boxes and their contents. Plaintiff alleged in the petition that he was a candidate in the election of March 31st, in which the official returns showed that he received 143 votes less than those received by Lopez; that he had discovered numerous irregularities occurring in the conduct of the election, including a discrepancy of as many as 53 ballots counted in one box in excess of the number of qualified electors in that box; that he had discovered other irregularities which he was advised were not necessary to be set out in the petition, but that because of them it was necessary that he be permitted to examine the contents of the ballot boxes in certain precincts in Harrison County, in order that he could determine whether the certified vote properly reflected the outcome of the election. Plaintiff further charged that the defendant Lindsey, Circuit Clerk, was custodian of the ballot boxes and subject to the directions of the court in the conduct of his office; and that the court had previously directed the clerk to permit plaintiff to make an examination of the boxes, but that the clerk had refused to do so without a mandatory order of the court. The petition charged that plaintiff had only twenty days in which to file a contest and that it was impossible for him to determine whether to file a contest unless he was permitted to examine the contents of the ballot boxes; that there was no other way in which he could examine them except by a writ of mandamus; and that it was the legal duty of the clerk to permit such examination.

Lindsey, the Circuit Clerk, filed a general demurrer to this petition on Friday, April 17th, and at the same time filed an agreement with Holleman to hear the cause in vacation on that day. At the hearing that morning, Albert Sidney Johnston, Jr., an attorney, appeared as "amicus curiae in behalf of Lopez," and argued the power of the court to issue a writ of mandamus. Johnston presented additional argument after the

noon recess, and the court then overruled the clerk's demurrer. Upon Lindsey declining to plead further, the court directed that a writ of mandamus issue. At that point, W. E. Gore, also an attorney for Lopez, asked for the right to intervene and to plead to the petition. Appellee objected to the intervention of Lopez. The court permitted Lopez to intervene, but declined to allow him until the next day to plead, on the ground that such action would tend to defeat the effect of the order which he had already made directing issuance of a writ of mandamus. Lopez then filed a pleading adopting the demurrer of the circuit clerk, and an answer charging in part that the circuit court had no power to hear the petition in vacation. The judge then stated to appellant's attorneys that he would "be glad to hear from you if you care to argue it," to which Gore replied, "I don't know that I care to argue it." Over an hour before the filing of appellant's petition for intervention, demurrer and answer, and the order allowing intervention, the record shows that the court had executed a written order directing issuance of the writ of mandamus against the circuit clerk. The court allowed an appeal without supersedeas.

The court's order directing issuance of the writ of mandamus to Lindsey, the circuit clerk, provided: "that the said Writ direct that no copies be made of any of the contents of any Ballot Boxes examined by authority of said Writ. The examination is to be made in the presence of Arnaud Lopez, Candidate for the office of District Attorney in said election and any one of his Attorneys in the event that either the said Arnaud Lopez or his attorneys appear and desire to be present and in the presence of the Circuit Clerk or his Deputies. It is further Ordered and Adjudged, that said Ballot Boxes or any contents thereof be not taken from the Courthouse. Any candidate in said election may examine any box in the entire District. The results of

the examination shall have no official or evidentiary significance.''

■■■ First dealing with the intervention aspect of this mandamus suit, we do not think that the circuit court committed any reversible error under these facts in failing to allow Lopez additional time within which to plead to the petition for mandamus. The circuit clerk, the defendant, was custodian of the ballot boxes and the officer whose duty was sought to be enforced by the suit. Lopez had no legal duty with reference to custody of the ballot boxes. The trial had been in progress for several hours and the judge had directed issuance of the writ of mandamus before Lopez asked to intervene. The court allowed appellant to intervene and file a demurrer and answer, which he did that day, and granted appellant the right to argue these pleadings, which appellant in effect declined to do, since the same issues had already been considered and decided. Hence we do not think the trial court abused its discretion in denying Lopez additional time to plead.

And there is no showing that Lopez was prejudiced in any way by the denial to him of additional time to plead, especially where the trial court had already directed issuance of the writ before a petition for intervention was filed by Lopez. An important factor entering into the discretion of the trial court on these issues was the fact that the contestant Holleman had only three more days within which to file his contest, and the court had the duty to protect contestants rights also by preventing further delay in issuance of the writ.

■■■ Nor was there any error in conducting the hearing in vacation. Code Sec. 1118 authorizes a trial in vacation of a mandamus proceeding in matters affecting the public interest, on petition of the state by its attorney general or district attorney, without any agreement for it. But the applicable statute here is Code Sec. 1523, which expressly provides that by consent of the parties,

a circuit judge may try cases in vacation and enter judgments thereon. The only two parties to this action when the trial began and when the order for the writ was entered were Holleman and the respondent Lindsey, the Circuit Clerk, and they filed a written agreement for a vacation hearing. Appellee objected to the intervention of Lopez, but did not cross-appeal from the order allowing it. For that reason, and in view of the circumstances stated above, we do not find it necessary to pass upon the debatable question as to whether in a case of this type a successful candidate has a right at law to intervene. Compare Shoemake v. Federal Credit Co., 188 Miss. 683, 192 So. 561, 565 (1940); Shuptrine v. Natalbany Lumber Co., 189 Miss. 409, 198 So. 24 (1940); Williams v. General Insurors, Inc., 193 Miss. 276, 6 So. 2d 922, 7 So. 2d 876 (1942). It is sufficient here to observe that the circuit clerk is official custodian of the ballot boxes, and that contestee had no legal duties in that respect. Hence he was not a necessary party to the suit, although he may have been a proper party. 35 Am. Jur., Mandamus, Sec. 327.

 With reference to whether the circuit court had power to issue a writ of mandamus to the circuit clerk to permit inspection of the ballot boxes, we have concluded that such power is necessarily supplemental to and in support of the statutory right of a candidate to contest a general or special election. Sec. 3287 authorizes a contest by the filing of a petition within twenty days after the election, "setting forth the grounds upon which the election is contested." We must assume that in passing this statute the Legislature had in mind a reasonable and workable method of contest. Code Sec. 3249, as well as Sec. 3287, affirms that assumption. Sec. 3249 provides that the manager shall preserve the ballot boxes, and "after each election the ballot boxes shall be delivered, with the keys thereof, to the clerk of the circuit court of the county for preservation; and he shall keep

them for future use, and, when called for, deliver them to the commissioners of election.''

In many instances a contestant could not ascertain whether he should contest an election unless he has a precedent opportunity to examine the ballot boxes in question. Under Sec. 3249 the circuit clerk keeps those boxes ''for future use.'' Sec. 3287 gives the candidate a right to contest the election. Considering those statutes together, we think that their effect is to place a duty upon a circuit clerk to allow proper inspection of ballot boxes by a candidate in the election, under restrictions which will protect the integrity of the ballots. Otherwise the right of contest given candidates in Sec. 3287 is substantially nullified. The order here in question, quoted above, contained proper restrictions to protect the integrity of the ballot boxes.

■■■ Relevant and analogous to this question is Code Sec. 3169, which gives any candidate in a primary election contest the right to have a full examination of ballot boxes at any time within twelve days after the canvass by the executive committee. In Sartin v. Barlow, 196 Miss. 159, 16 So. 2d 372 (1943), a writ of mandamus against a circuit clerk was approved for that purpose. It was said that this right of inspection is one ''by which in its main objective the candidate is made a mere instrumentality in the better assurance of an honest, impartial and lawful election.'' This primary statute, Sec. 3169, is in pari materia with Sec. 3287, in that it is indicative of a general policy of the state on a cognate subject matter to allow contesting candidates the right to obtain the facts concerning an election precedent to filing a contest. ■■■ Statutes relating to the same or a closely allied subject may be regarded as in pari materia where the statute in question is silent. These principles have been applied in election cases to statutes dealing with elections for issuance of municipal bonds and for the exclusion from a county of light wines and beer.

Spencer v. Mayor and Board of Aldermen of Yazoo City, 60 So. 2d 562 (Miss. 1952); Simpson County v. Burkett, 178 Miss. 44, 55, 172 So. 329 (1936); Neal v. Board of Supervisors of Carroll County, 63 So. 2d 540 (1953).

After the writ of mandamus was issued on April 17, Friday, appellee Holleman and his attorneys, in the presence of the circuit clerk and his deputies, and under the restrictions set forth in the judgment, proceeded to examine the contents of certain ballot boxes in Harrison County, until a supersedeas was granted by three judges of this Court on April 20th. At that time appellee complied with the supersedeas, stopped examination of the boxes and filed in the Circuit Court of Pearl River County a suit contesting the election, as authorized by Code Sec. 3287.

## II.

It is contended for appellant that appellee's failure to allege and prove that the illegal votes which were cast were voted for appellant Lopez is fatal to appellee's contest, and that therefore contestant failed to meet his necessary burden of proof.

The jury found as a fact that the election held at Biloxi Precinct No. 4 and the White Plains Precinct in Harrison County was illegally held, declared those boxes null and void, and found that contestant Holleman received the greatest number of legal votes, and the final judgment so adjudicated. Appellant-contestee waived a motion for a new trial.

Code Sec. 3267 provides in part: ". . . every person entitled to vote shall deliver an official ballot, prepared in accordance with law, to one of the managers in the presence of the others, which ballot shall be put into the ballot box, and at the same time one of the clerks shall take down on a list the name of every person voting, and the other shall make the proper entry on the pollbook."

Code Sec. 3268 further has this requirement: "At each election the managers shall cause one of the clerks to

write in the pollbook the word 'voted', in the column having at its head the date of the election, opposite the name of each elector as he votes.''

These statutes require the election managers to have a clerk to record a list of the names of those voting, and another clerk to make a similar entry on the pollbook.

At Biloxi Precinct No. 4 the official returns showed that Lopez received 311 votes, Wallace 24, and Holleman 14, making a total of 349 votes as returned by the election officers. Lindsey, Circuit Clerk of Harrison County, testified that he found in the box 350 voted ballots, that the tally sheet showed 349, that the voters' list showed 342, and that the pollbook for Biloxi Precinct No. 4 reflected that 302 voted. This represented a substantial discrepancy as between the official returns, the voters' list, and the precinct pollbook.

Contestant Holleman introduced 46 witnesses, and in summary form, with reference to Biloxi Precinct No. 4, their testimony shows without dispute as follows: Thirty-eight citizens, who did not vote in the election at all, are shown by both the pollbook and the voters' list, prepared by and under the direction of the election managers, to have voted. Both the voters' list and the pollbook showed that four persons who were dead at the time of the election voted. Three persons testified that they voted for Lopez when in fact they were disqualified to vote. The voters' list reflected that three electors voted twice each, although they testified that they actually voted only once. Hence the undisputed testimony reflects that at Biloxi Precinct No. 4 there were at least 48 illegal and fraudulent votes, constituting more than thirteen per cent of the total return. Most of them were recorded on both the voters' list and the pollbook, which were under the control and direction of the election managers.

At the White Plains Precinct the official returns reflected that Lopez received sixty votes, Holleman five,

and Wallace none, making a total official return of 65 votes. The pollbook showed that 62 votes were cast instead of 65. It also reflected that seventeen persons voted who were not qualified electors because they were delinquent in their poll taxes. The undisputed evidence also showed that seventeen persons were marked on the precinct pollbook as having voted who did not in fact vote; and that the election managers knew quite well at least ten of these seventeen. Hence the undisputed proof as to the White Plains Precinct reflected that at least seventeen illegal and fraudulent votes were cast, constituting more than twenty-six per cent of the total return as recorded on the pollbook, which was under the control and direction of the election managers. Moreover, in the White Plains Precinct the election managers did not keep any voters' list, although the same is expressly required by Code Sec. 3267. The importance of a voters' list in discouraging and detecting fraud in elections is well illustrated by the returns at this box. Compare Hayes v. Abney, 186 Miss. 288, 188 So. 533 (1939).

■■■ Appellee charged and amply proved, we think, that the election managers at these two boxes conducted the election in a corrupt and fraudulent manner. The jury found this to be a fact. It is not reasonably possible that the election managers at these boxes were unaware of what was going on. At Biloxi Precinct No. 4 their entire election records, both the pollbook and the voters' list under their control, reflected that 38 persons voted who did not in fact vote, that four dead persons voted, that three persons voted twice, although they in fact voted only once, and that three disqualified persons voted. At the White Plains Precinct at least seventeen persons are shown by the pollbook to have voted, although in fact they did not vote, and although the election managers knew most of them well. Nor did the managers keep any list of voters at this box as required by statute.

It is conceivable that a few instances of fraudulent votes might occur without the knowledge, consent or assistance of the election managers, but the quantity of the fraudulent votes cast in these two boxes was of such a widespread nature as to impeach the entire returns from both boxes, and to require the conclusions (a) that the election officials at these two boxes knowingly permitted the voters' list and pollbook to be marked showing a large number of people voted who in fact had not voted; (b) that they knowingly permitted ballots to be deposited in the ballot boxes as the ballots of people who had not voted; and (c) that the election officers at these boxes knowingly made returns including such ballots.

The contestee did not offer the election managers and officers at these two boxes as witnesses, and there is no denial in the record of these facts and conclusions. In fairness to appellant, however, we note that he testified that he had nothing to do with and knew nothing about any of the frauds in these two boxes, that he was amazed when he heard the testimony, and that he was only trying to get every vote he could in the right way. There is no evidence that appellant knew of or participated in this fraud. However, that does not affect the question of whether the returns from these boxes can be accepted in any respect. In fact, appellant admits that "appellee probably showed that 44 fraudulent votes were cast at Biloxi Precinct 4," and that "there can be no question that fraud was perpetrated at both Biloxi No. 4 and White Plains Precincts." Appellant argues that excluding the proved illegal votes, he still received a sufficient majority for election, if the remaining votes in those boxes are counted. But the error in that position is that the fraud of the election officers was so widespread, the jury found, as to impeach the entire returns from the two boxes.

At the end of the testimony the case was submitted to a jury. Appellee's instruction with reference to Biloxi

Precinct No. 4, which was similar to the one concerning the White Plains Precinct, submitted the following issues: "The Court instructs the jury for the contestant Boyce Holleman that if you believe from all of the evidence, that it has been clearly and convincingly proved, beyond a mere preponderance of the evidence that the persons who were the election officials holding the election in Biloxi Precinct No. 4 knowingly permitted the voters' list and pollbooks to be marked showing people voted who in fact had not voted, if any, and knowingly permitted ballots to be deposited in the ballot box for said precinct as the ballots of people who had not voted, if any, and the election officials knowingly made a return including such ballots; if any, as counted.

"And if the jury further believes from clear and convincing proof from evidence beyond a mere preponderance of the evidence that the above mentioned practices if any were so widespread that the true status of the vote of Precinct No. 4 at Biloxi, Miss. cannot possibly be ascertained then the jury may entirely reject the entire official return of the box at Biloxi Precinct No. 4 in which event if any the form of your verdict may be:

" 'We, the jury find that the contestant Boyce Holleman received the greatest number of legal votes at the election.' "

The jury made a finding in accordance with that instruction and found that the election at both of the boxes in question was illegally held, null and void, and that contestant received the greatest number of legal votes. The verdict and judgment for appellee are amply supported by the record.

■■■ The rule applicable to the facts in this case is stated in 29 C. J. S., Elections, Sec. 217, pp. 319, 320: "Fraud invalidates the ballot, and where in a particular precinct or precincts, election officers have committed or permitted fraud of such a character and extent that the true result cannot be ascertained with reasonable cer-

tainty, the entire returns from that precinct or precincts should be rejected, as where fraud and irregularities occur to such an extent that it is impossible to separate with reasonable certainty the legal from the illegal or spurious votes, . . . where an election attempted to be held in one precinct is so fraudulent that it is impossible to determine the number of legal votes cast therein, or for whom they were cast, the court may throw out and disregard the returns from that precinct and adjudge the election to the candidate receiving the highest number of legal votes cast in the other precincts of the territory in which the election is held.''

See also 18 Am. Jur., Elections, Secs. 224, 225 and 229.

 We do not have a case here where there are mere irregularities in the conduct of the election, or fraud by a candidate or outside conspirators. The fraud found here is that of the election officials themselves, the managers of the boxes in question. These guardians against fraud became, the jury found, the perpetrators of it. It is the general rule that the returns of election officers are presumed to be valid and properly made. But this presumption and its prima facie correctness fails where the managers have participated in fraud of such a pervasive nature as to impeach their entire returns. 29 C. J. S., Elections, Sec. 240; 18 Am. Jur., Elections, Secs. 302, 303.

McCrary, Elections, Secs. 472 and 476, states also in a concise manner the applicable rule: ''While the poll books kept by the proper officers are *prima facie* evidence of the number of votes cast and of the result of the election, they may, as we have elsewhere seen, be impeached for fraud or mistake. Thus it was held in Kansas that when the judges and clerks of an election intersperse fictitious names in the list of voters on the poll books, and deposit spurious ballots in the ballot box, the poll books and returns made by such officers are worthless as evidence, and must be altogether rejected. In such a case there must be evidence *aliunde* showing the num-

ber of honest votes cast, and for whom cast, or the whole vote must be thrown out.''

''While a mere irregularity which does not affect the result, will not vitiate the return, yet where the provisions of the election law have been entirely disregarded by the officers, and their conduct has been such as to render their returns utterly unworthy of credit, the return must be rejected. In such a case the returns prove nothing. But it does not follow that legal votes cast at such poll must be lost. They may be proven by secondary evidence (the return being, until impeached, the primary evidence), and when thus proven may be counted.''

In other words, the authorities make a substantial distinction between illegal practices by persons who are not election officers and fraudulent practice by the election officers themselves. When the return in any precinct has been shown to be so tainted with fraud by the election managers that the truth cannot be deducible from it, then it should never be permitted to form a part of the canvass. McCrary, Elections, Secs. 534, 536. McCrary, Sec. 539, clearly makes this distinction: ''There is a difference between a fraud committed by officers or with their knowledge and connivance, and a fraud committed by other persons, in this: the former is ordinarily fatal to the return, while the latter is not fatal, unless it appear that it has changed or rendered doubtful the result. If an officer of the election is detected in a willful and deliberate fraud upon the ballot box, the better opinion is that this will destroy the integrity of his official acts, even though the fraud discovered is not, of itself, sufficient to affect the result. The reason of this rule is, that an officer who betrays his trust in one instance, is shown to be capable of the infamy of defrauding the electors, and his certificate is, therefore, good for nothing.''

See also McCrary, Secs. 540-542. To the same effect is the excellent discussion of this subject in Paine, Elections, Sec. 596; see also ibid, Secs. 499-501. The quoted provisions in both McCrary's and Paine's books were

cited with approval in Sproule v. Fredericks, 69 Miss. 898, 907, (1892), hereinafter discussed.

We think that these authorities dealing with fraud by election officers are sound. The decisions by this Court have followed the stated principles. The leading case in Mississippi is Word v. Sykes, 61 Miss. 649 (1884). Sykes was certified as elected county sheriff at the general election in November, 1883. The contestant charged that the election at certain boxes had been conducted fraudulently by the election managers. On appeal by the contestant the Court reversed and remanded the case for errors in the exclusion of certain evidence. The trial court erred in excluding the testimony of Watson, who was offered to testify that many men were marked "voted" at one box who had in fact not voted, and some of whom were dead. The Court said: "We can scarcely see how anything could be more directly competent, both as proving fraud at the box and the participation therein of those connected with the management of the election."

It was further held that the returns of the canvassers were competent, and established a presumption of correctness. The contestant must first affirmatively show that he received a majority of the legal votes. He could first rely upon the majority cast for him at the four undisputed boxes in question. The Court then said: "He may attack the other boxes in any way he chooses, and if he does so for fraud he must affirmatively show the fraud. This he may do by any means appropriate to that issue, and he overthrows the legal presumption against him when he shows the actual participation in any unfair and fraudulent practice of those who handled the votes or returned the count at that box, and in so doing he may adopt his own order of proof. No mere error, omission, or irregularity on the part of the returning officers can result in setting aside the certificate. Any practice which may be thought purposely to have been resorted to for influencing the result will have that effect if those who made the return knew of or sanctioned it. Speaking for

myself alone, and not for the court, I think that the *prima facie* presumption of correctness in the certificate fails whenever it is affirmatively shown that (as is alleged in this case) one side only participated in making out the returns and the other side was excluded from conducting the election and making the count. In such case, to speak more accurately, I think the *prima facie* presumption of correctness never attaches. We all think that it fails where it is shown that there was any intentional wrong on the part of those who made the count. Whenever by any means this *prima facie* presumption is overthrown, either side may show what was the true state of the vote at that box, which is never to be entirely thrown out if it can by any process be discovered what that true state was; where this is wholly impossible, and in this event only, can the entire box be rejected.''

Hence in Word v. Sykes it was held that the *prima facie* presumption of correctness of the officers' returns from a box is rebutted and fails where it is shown that there was intentional wrong and fraud on the part of the election managers. Thereafter either side could show what was the true vote at the box. Legal votes must be preserved if possible and if proved under these circumstances. But where each candidate fails to show the number of legal votes cast for him, and it is undisputed that the election managers were guilty of intentional fraud, the entire box must be rejected. That was what occurred in the present case.

The earlier case of Pradat v. Ramsey, 47 Miss. 24 (1872), dealt with mere irregularities and not fraud by the managers of election, but the rule later applied in Word v. Sykes was forecast in *Pradat.*

In Sproule v. Fredericks, 69 Miss. 898, 11 So. 472 (1892), it was held to be error to sustain a demurrer to an election contest petition charging fraud by the election officers, and the court cited with approval the above quoted statements from McCrary on Elections and Paine on Elections. In State v. Laizer, 77 Miss. 146, 25 So. 153

(1889), it was held to be error to sustain a demurrer to a petition contesting a mayor's election which charged fraud by the election officers.

Hutson v. Miller, 148 Miss. 783, 114 So. 820 (1927) affirmed a jury verdict for contestant where there was fraud by the election officers. It was said that fraud vitiates everything it enters into. Simmons v. Crisler, 197 Miss. 547, 20 So. 2d 85 (1944), was a contest of a special election for district attorney. A peremptory instruction for the contestant was affirmed. The basis of that action of the trial court was fraud by the election officers at the Mound Bayou Precinct, where contestee received 78 votes, contestant none, and another candidate two votes. The official returns certified that appellant-contestee received nine more votes than contestant, out of a total in the district of 4,828. There was evidence of fraud by the election officers at the Mound Bayou box, including proof that the voters' list showed at least 26 persons to have voted who did not vote. The Mound Bayou returns were held to be void, and the judgment was for contestant. However, on appeal the contestee-appellant did not challenge that finding, but only attacked votes at two other precincts at which contestant obtained majorities, and appellant's contentions as to them were rejected.

Under the primary election statutes, Harris v. Stewart, 187 Miss. 489, 193 So. 339 (1940), involved a charge of fraud by the election officers in a petition contesting a primary election, and this Court affirmed the overruling of a demurrer to that petition, where it was averred that the managers at the two boxes in question knowingly permitted the illegal votes and actually encouraged them. Moreover, the primary election statute, Sec. 3167, on an issue analogous to the present one, gives the county executive committee the power to throw out an entire box where it is impossible to arrive at the will of the voters at that precinct and the managers at that box deliberately permitted or engaged in material irregularities and fraud by manipulating the election and the returns.

In summary, there was ample proof to support the verdict of the jury which excluded the entire returns at both Biloxi Precinct No. 4 and White Plains Precinct in Harrison County. The returns of election officers are *prima facie* correct, but where, as here, they have been shown to be false because of deliberate and widespread fraud of the election officers, such returns have no *prima facie* validity, the same having been rebutted, and thereafter each candidate claiming any legal votes at the precinct in question must prove them by evidence other than the returns. We find no merit in the other assignments of error.

Affirmed.

*Roberds, P. J.,* and *Lee, Kyle* and *Holmes, JJ.,* concur.